# EXHIBIT A

Michael G. Olinik    SBN # 291020
The Law Office of Michael G. Olinik
501 W. Broadway, Suite 800
San Diego, CA 92101
(619) 780-5523
michael@oliniklaw.com

Attorney for Plaintiff Ronald A. Marron

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SAN DIEGO**
**CENTRAL DIVISION**

| | |
|---|---|
| RONALD A. MARRON, on behalf of himself and all others similar situation, and the general public, | Case No:  37-2024-00006839-CU-BC-CTL |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** |
| v. | (1)   BREACH OF CONTRACT; |
| JPMORGAN CHASE BANK, N.A., a national banking association, and DOES 1-10, INCLUSIVE, | (2)   FRAUD IN THE INDUCEMENT; |
| Defendant. | (3)   FRAUDULENT MISREPRESENTATION; |
| | (4)   FALSE PROMISE; |
| | (5)   NEGLIGENT MISREPRESENTATION; |
| | (6)   PROMISSORY ESTOPPEL; |
| | (7)   NEGLIGENCE; |
| | (8)   VIOLATION OF THE UNFAIR COMPETITION LAWS; and |
| | (9)   REFORMATION |
| | UNLIMITED CIVIL ACTION |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff Ronald A. Marron, on behalf of himself and all others similarly situated, alleges against Defendant JPMorgan Chase Bank, N.A. ("Chase"), a national bank, the following upon his own personal knowledge, or where there is no personal knowledge, upon information and belief.

## I. <u>INTRODUCTION</u>

1. In the midst of rising interest rates, mortgage lenders began offering rate lock agreements to potential homeowners to purportedly protect the homeowners by locking in an interest rate for a certain period of time, giving the homeowners the opportunity to look for a property without worrying about the interest rate on the mortgage going up. Of course, the lenders did not do this out of the kindness of their hearts but instead charged customers a fee for these agreements, one that would be non-refundable even if the mortgage was never consummated.

2. When Chase offered a rate lock to Mr. Marron and other class members, Chase included a representation of what their interest rate would be, including what discount points would be included in the locked rate, which included an assessment of all the discount points the potential borrowers were entitled to. Based on those representations, Mr. Marron and the members of the class agreed to enter into the "Lock In Agreement" and paid the fee for the Lock In Agreement. They also forwent looking for other loan products from competitors.

3. After entering the Lock In Agreement, Chase then reviewed Mr. Marron and other class members' discount points. Nothing had changed regarding their accounts, yet Chase unilaterally decided that the analysis of discount points they previously represented as accurate was no longer correct and they were entitled to fewer discount points. Thus, despite the Lock In Agreement, Chase charged Mr. Marron and the class members a higher interest rate than he paid for in the Lock In Agreement. This cost Mr. Marron and the class members thousands of dollars over the life of the loan, and as the transaction was nearly complete, Mr. Marron and the class members were unable to shop for a different mortgage. This action seeks to recover the difference in the money Mr. Marron and the class members have spent to date and seeks to reform the note and deed of trust to reflect the promised interest rate.

/ / /

/ / /

## II. JURISDICTION AND VENUE

4.      Pursuant to Article VI, § 10 of the California Constitution, subject matter jurisdiction is proper in the Superior Court of California, county of San Diego.

5.      The amount in controversy under this Complaint exceeds the jurisdictional minimal jurisdictional limit of this Court, and the claims asserted in this Complaint are within the subject-matter jurisdiction of this Court, as the mortgage at issue is valued at over $25,000.

6.      This Court has personal jurisdiction over Defendant because it is an association, corporation, limited liability company, business entity, national association, and/or person that resides in, are based in, authorized to, and/or registered to conduct, and in fact do conduct, substantial business in the state of California, county of San Diego.

7.      Venue is proper in this Court because material acts upon which this Complaint is based upon occurred in the county of San Diego, and because Defendant conducts substantial business, holds significant contacts, operate business facilities, and entered into a contract with Plaintiff within the state of California, county of San Diego.

## III. PARTIES

8.      Plaintiff Ronald Marron, a natural person, is, and at all times mentioned herein was, a resident and citizen of the state of California.  During the Class Period, Mr. Marron entered into a Lock In Agreement with Defendant.

9.      Defendant JPMorgan Chase Bank, N.A., is a national bank with its principle place of business located in New York, New York.

10.     The true names and capabilities, whether individual, corporate, associate, or otherwise, of the Doe Defendants 1 through 10, are unknown to Plaintiffs, and therefore sue these Doe Defendants by such fictitious names pursuant to California Code of Civil Procedure § 474.  Plaintiffs will seek leave to amend this Complaint to show their true names and capacities when the same has been ascertained.

11.     Plaintiffs are informed and believe, and based thereon allege, that each of the Doe Defendants were, or are, in some way or manner, responsible and liable to Plaintiffs and Class Members for the events, happenings, and damages hereinafter set forth in the body of this Complaint.

3

1    Plaintiffs are informed and believe, and based thereon allege, that said Doe Defendants may be
2    responsible for the damages and injuries suffered by Plaintiffs and Class Members on alternative
3    theories of liability not specifically addressed herein.

4        12.    Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each
5    of them, were, and are, an owner, co-owner, agent, representative, partner, and/or alter ego of its co-
6    defendants, or otherwise acted, and continue to act, on behalf of each and every remaining defendant
7    and, in doing the things hereinafter alleged, were, at all times material hereto, acting within the course
8    and scope of their authorities as an owner, co-owner, agent, representative, partner, and/or alter ego of
9    its co-defendants, with the full knowledge, permission, consent, and authorization of each and every
10   remaining defendant, each co-defendant having ratified or promoted the acts of the other co-
11   defendants, such that each of them are jointly and severally liable to Plaintiffs and Class Members.

12   ### IV.  GENERAL ALLEGATIONS

13       13.    Mr. Marron approached Chase in 2021 in order to obtain a mortgage on his property
14   located at 3385 B Street, San Diego, CA 92101, San Diego County ("Property").

15       14.    When negotiating the mortgage, Chase offered Mr. Marron a Lock In Agreement,
16   promising to hold the interest rate for the mortgage for a period of 45 days in exchange for the
17   payment of a Lock-In Fee.  A true and correct copy of the Lock In Agreement is attached hereto as
18   **Exhibit 1**.

19       15.    Chase was the sole drafter of the Lock In Agreement.

20       16.    In the Lock In Agreement, Chase represented to Mr. Marron that his interest rate would
21   be locked in at 2.625% until March 29, 2021.  Mr. Marron's total discount points were set to 0.764%.

22       17.    The Lock In Agreement also came with a disclaimer, reading:

23       The rate and points stated in this agreement are based on several factors, including but
         not limited to: loan amount, documentation type, loan type, occupancy type, property
24       type, credit score, and loan to value (which is your loan amount compared to your
         property value). The final rate and points may be higher or lower based on information
25       relating to factors such as those listed above, which may be determined after the date of
         this agreement.
26

27       18.    Mr. Marron agreed to the terms of the Lock In Agreement and paid the Lock-In Fees.
28

19. Before the mortgage became final, Chase informed Mr. Marron that his interest rate would be higher than the interest rate promised in the Lock In Agreement. The reason Chase gave for the increase in the interest rate was that Chase determined that one of the accounts they had previously counted towards Mr. Marron's discount points would no longer be counted towards discount points.

20. There was no change in the type of accounts Mr. Marron had from when Chase made the representation of the discount points in the Lock In Agreement and when Mr. Marron executed the note and deed of trust. Chase simply determined that they had incorrectly calculated the discount points in the Lock In Agreement despite having all of the information available to it at the time they offered the Lock In Agreement.

21. The new interest rate Chase gave to Mr. Marron in the note and the deed of trust was 2.75%, an increase of 0.125% over the rate promised in the Lock In Agreement. A true and correct copy of the deed of trust is attached as **Exhibit 2**. Upon information and belief, the note is in the possession of Chase.

22. Mr. Marron would not have signed the Lock In Agreement and would have shopped around for better interest rates if Chase had accurately calculated the discount points when it offered the Lock In Agreement.

23. Mr. Marron could not shop around for different mortgages at the time Chase offered the final rate of 2.75% because interest rates had increased in the meantime, Mr. Marron had already paid the Lock-In Fees, and the transaction was too far along to back out at that point.

24. Mr. Marron has timely paid his mortgage payments

## V. <u>CLASS ALLEGATIONS</u>

25. Mr. Marron brings this class action on behalf of himself and all Members of the Class ("Class"), initially defined as:

> All persons who entered into a Lock In Agreement with JPMorgan Chase Bank, N.A. to secure an interest rate on a residential mortgage and who were eventually given an interest rate higher than the one represented in the Lock In Agreement during the applicable statute of limitations ("Class Period").

26. There exists a subclass of Class Members who reside in California, defined as:

> All persons who are residents of California and/or who took out a mortgage on real property secured in the state of California and who entered into a Lock In Agreement

5

with JPMorgan Chase Bank, N.A. to secure an interest rate on a residential mortgage and who were eventually given an interest rate higher than the one represented in the Lock In Agreement during the Class Period.

27. This action is being brought as a class action pursuant to California Code of Civil Procedure § 382 because there is a well-defined community of interest, and the proposed Class is easily ascertainable. Further, a class action is appropriate because Chase acted, or refused to act, on grounds generally applicable to the Class, making class-wide relief appropriate.

28. The proposed members in the Class may be jointly referred to as "Class Members."

29. Upon information and belief, Chase unilaterally declared that the calculations on the Lock In Agreement of Class Members were no longer valid, changing the terms of the mortgages so that Class Members paid high interest rates earlier than Class Members originally agreed to.

30. As a result of Chase's actions, Class Members suffered damages due to paying higher interest rates than originally agreed to.

31. Plaintiff reserves the right to amend or modify the Class and/or add Subclass definitions with greater specificity or further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

32. The Court can define the Class and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class Members if, based on discovery of additional facts, the need arises.

**Commonality**

33. This action may be brought as a class action because common questions of law and fact predominate over any issues solely affecting individual Plaintiffs or Class Members, including, but not limited to:

- Whether Chase illegally modified agreed-upon interest rates after they were accepted by Class Members who paid for them to be "locked in";

- Whether Chase intentionally and/or negligently represented the "locked in" interest rate to Class Members;

- Whether Chase is estopped from altering the rate in the Lock In Agreement; and

- Whether, for the California Subclass, Chase was unjustly enriched through their unilateral modification of the Lock In Rate.

**Numerosity**

34.     This Class consists of potentially hundreds of individuals who entered into a Lock In Agreement with Chase only to have Chase unilaterally change the interest after signing a Lock In Agreement within the defined Class Period.  The Members of the Class are so numerous that joinder of each Member is impracticable, if not impossible.  As such, a class action is the only available method for the fair and efficient adjudication of this controversy.

**Ascertainability**

35.     Class Members can easily be identified by an examination and analysis of the Lock In Agreements Chase entered into that eventually lead to mortgages with a higher interest rate, among other records within Chase's possession, custody, or control.

**Typicality**

36.     Plaintiff's claims are typical of the claims of each Class Member in that all claims result from Chase's unilateral modification of mortgages, as alleged herein.  Moreover, Plaintiff's claims are typical of the claims of each Class Member because each have sustained damages arising out of, and caused by, Chase's common course of unlawful conduct, as alleged herein.  As such, Plaintiff has the same interest in this matter as all Members of the Class, and have no interests antagonistic to the interests of other Members of the Class.

**Superiority**

37.     This action is brought as a class action because this method is superior for the fair and efficient adjudication of the controversy.  This action seeks only declaratory judgment regarding the illegally modified mortgages and does not seeking individual damages; seeking declaratory relief on behalf of the class is superior as each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Chase's liability.  A class action is the only practicable method by which the Plaintiff and Members of the Class can achieve redress from Chase and prevent Chase from unjustly benefitting from its course of unlawful conduct, as alleged herein.  The prosecution of individual actions would

present a risk of inconsistent judgments, even though each Class Member has an effectively identical claim of right against Chase. Inconsistent judgments could be dispositive to the interests of other Class Members who are not parties to the individual adjudication and/or may substantially impede their ability to adequately protect their interests. If separate actions were brought, or are required to be brought, by individual Class Members, the resulting multiplicity of lawsuits would cause an undue hardship and burden on the parties and the judicial system. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Chase's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**Adequacy**

38.     Plaintiff is an adequate representative of the Class. Plaintiff's claims are typical of those of the Class. Plaintiff and Class Members have no unique claims, have no conflicts of interest, and share the same interests in the litigation of this matter. Plaintiff retained competent counsel experienced in the prosecution of class actions, and is committed to the vigorous prosecution of this action. Further, Plaintiff's counsel have the ability and willingness to commit significant resources to the prosecution of this matter. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class with the help of experienced and knowledgeable retained counsel.

## VI.  CAUSES OF ACTION

### First Cause of Action

### Breach of Contract

39.     Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

40.     Chase offered Lock In Agreements to Mr. Marron and Class Members. Mr. Marron's Lock In Agreement is attached to the Complaint as Exhibit 1.

41.     Mr. Marron and the Class Members accepted the offer of the Lock In Agreement and paid the Lock-In Fee.

8

42.     Mr. Marron and Class Members have performed all obligations under both the Lock In Agreement and the note and deed of trust that resulted from the Lock In Agreement.

43.     Chase failed to perform the Lock In Agreement by giving Mr. Marron and Class Members an interest rate that was different than the one in the Lock In Agreement. For example, Mr. Marron was given an interest rate of 2.75 instead of 2.625% as promised by his Lock In Agreement.

44.     As a result, Mr. Marron and Class Members suffered damages because they had to pay more than what his mortgage would have been if the deed of trust and note had complied with the Lock Rate Agreement.

### Second Cause of Action

### Fraud in the Inducement

45.     Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

46.     Chase offered the Lock In Agreement to Mr. Marron and Class Members in exchange for the Lock-In Fee.

47.     Chase calculated Mr. Marron's and the Class Members' discount points based on all information and presented those discount points in the Lock In Agreement despite being under no obligation to address discount points in the Lock In Agreement.

48.     Chase knew that it would lower the discount points after Mr. Marron and the Class Members signed the Lock In Agreements and paid the Lock In Fee. Therefore, Chase knew that the discount points stated in the Lock In Agreements were false.

49.     Chase provided Mr. Marron and Class Members with more discount points than it would end up giving Mr. Marron and Class Members when it offered Mr. Marron and Class Members the note and deed of trust to get Mr. Marron and Class Members to enter into the Lock In Agreement and pay the Lock-In Fee, as well as to ensure Mr. Marron and Class Members would stop shopping around for other offers from other banks due to his sunk cost in paying the Lock-In Fee.

50.     As a result of Chase's inducement of Mr. Marron and Class Members, Mr. Marron and Class Members entered into the Lock In Agreement and ultimately entered into a note and deed of trust in reliance on Chase's representation of the discount points in the Lock In Agreement.

9

51.     Mr. Marron and the Class's reliance on Chase's representation of the discount points was reasonable as, even despite the notice that the discount points could be adjusted.

52.     Mr. Marron and the Class Members would not have entered into the Lock In Agreement and ultimately notes and deeds of trust/mortgages if Chase had not misrepresented his discount points in the Lock In Agreement.

53.     As a result of Chase's conduct, Mr. Marron and Class Members have suffered damages in the amount of extra money paid each month for the mortgage due to the increase of the interest rate.

### Third Cause of Action

### Fraudulent Misrepresentation

54.     Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

55.     Chase represented to Mr. Marron and Class Members in the Lock In Agreement that they were entitled to a specific number of discount points.

56.     Chase later unilaterally changed the amount of discount points given to Mr. Marron and Class Members, decreasing the discount points, which in turn increased the interest rate paid by Class Members.

57.     At the time Chase represented the discount points to Mr. Marron and the Class Members in the Lock In Agreements, Chase knew that the representation was false because Chase had.  Alternatively, Chase recklessly made the misrepresentation by miscalculating the discount points despite having all of the information necessary to perform the correct calculations.

58.     Chase intended on Mr. Marron and Class Members to rely on its representation of the discount rate and the interest on the note and deed of trust in order to get Mr. Marron and Class Members to sign the Lock In Agreement, pay the Lock-In Fees, and ultimately obtain a note and deed of trust with Chase.

59.     Mr. Marron and Class Members reasonably relied as, even despite the notice that the discount points could be adjusted.

60.     Mr. Marron and Class Members would not have entered into the Lock In Agreement and ultimately the note and deed of trust/mortgages if Chase had not misrepresented his discount points in the Lock In Agreement.

61.     As a result of Chase's conduct, Mr. Marron and Class Members have suffered damages in the amount of extra money paid each month for the mortgage due to the increase of the interest rate.

## Fourth Cause of Action

### False Promise

62.     Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

63.     Chase made a promise to Mr. Marron and Class Members that their interest rate would be locked in based on a discount rate provided in the Lock In Agreement.

64.     Chase did not intend to perform this promise as made because Chase knew that, ultimately, it would reduce the discount points.

65.     Chase intended on Mr. Marron and Class Members to rely on its representation of the discount rate and the interest on the note and deed of trust in order to get Mr. Marron and Class Members to sign the Lock In Agreement, pay the Lock-In Fees, and ultimately obtain a note and deed of trust/mortgage with Chase.

66.     Mr. Marron and Class Members reasonably relied on Chase's representation in the Lock In Agreement.

67.     Mr. Marron's and the Class Members' reliance on Chase's false promise was a substantial factor in causing Mr. Marron and Class Members harm because Mr. Marron and Class members would not have entered into the Lock In Agreement and ultimately the note and deed of trust/mortgage if Chase had not misrepresented his discount points in the Lock In Agreement.  Mr. Marron and Class Members would have continued shopping around for a better rate at the time he entered the Lock In Agreement.

68.     Chase ultimately offered Mr. Marron and the Class Members a higher interest rate.

69.     As a result of Chase's conduct, Mr. Marron and Class Members have suffered damages in the amount of extra money paid each month for the mortgage due to the increase of the interest rate.

## Fifth Cause of Action

### Negligent Misrepresentation

70.     Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

71.     Through the Lock In Agreement, Chase represented that Mr. Marron and the Class Members's discount rate would be a certain number and the interest rate would be a certain number.

72.     Chase ultimately lowered the discount rate, which resulted in interest rates on the final norte and deed of trust/mortgage that were higher than the interest rate quoted in the Lock In Agreement.

73.     Although Chase quoted certain discount rates, Chase had no reasonable grounds for believing that the representation was true when it made the representation because it had all the information available to it to calculate the proper discount rate and did not accurately calculate the discount rate.

74.     Chase intended on Mr. Marron and Class Members to rely on its representation of the discount rate and the interest on the note and deed of trust/mortgage in order to get Mr. Marron and Class Members to sign the Lock In Agreement, pay the Lock-In Fees, and ultimately obtain a note and deed of trust/mortgage with Chase.

75.     Mr. Marron and Class Members reasonably relied on Chase's representations.

76.     Mr. Marron was harmed because Chase ultimately offered Mr. Marron and Class Members a higher interest rate, such as an interest rate of 2.75% instead of 2.625% for Mr. Marron.

77.     Mr. Marron's and the Class Members' reliance on Chase's false promise was a substantial factor in causing Mr. Marron and Class Members harm because Mr. Marron and Class Members would not have entered into the Lock In Agreement and ultimately the note and deed of trust/mortgage if Chase had not misrepresented his discount points in the Lock In Agreement.  Mr. Marron and Class Members would have continued shopping around for a better rate at the time they entered the Lock In Agreement.

78.     As a result of Chase's conduct, Mr. Marron and Class Members have suffered damages in the amount of extra money paid each month for the mortgage due to the increase of the interest rate.

**<u>Sixth Cause of Action</u>**

**Promissory Estoppel**

79.  Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

80.  Chase promised Mr. Marron and Class Members through the Lock In Agreement that it would lock the interest rate on Mr. Marron's and Class Members' note and deed of trust/mortgage in the amount stated in the Lock In Agreement based on Chase's own calculations of Mr. Marron's and Class Members' discount rates.

81.  Chase reasonably expected Mr. Marron and Class Members to enter into the Lock In Agreement and pay the Lock-In Fees, as well as forebear shopping for better interest rates elsewhere, based on the promise Chase made to Mr. Marron and Class Members.

82.  Mr. Marron and Class Members stopped shopping for other mortgages with better interest rates based on Chase's promise, signed the Lock In Agreement, and paid the Lock-In fees.

83.  After Mr. Marron and Class Members signed the Lock In Agreement and paid the Lock-In fees, Chase nevertheless presented Mr. Marron and Class Members with higher interest rates in the final note and deed of trust/mortgage.

84.  As a result of Chase's conduct, Mr. Marron and Class Members have suffered damages in the amount of extra money paid each month for the mortgage due to the increase of the interest rate.

85.  Justice can only be served by enforcing the original interest rate stated in the Lock In Agreement because the increase of the rate was entirely due to Chase's error, and Chase obtained Lock-In Fees from Mr. Marron and Class Members in addition to now charging him more interest on his mortgage, increasing his payments every month.

**<u>Seventh Cause of Action</u>**

**Negligence**

86.  Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

87.  Through the Lock In Agreement, Chase represented that Mr. Marron and Class Members' discount rate and the interest rate would be what was stated in the Lock In Agreement.

88.     Chase had a duty to properly calculate the discount points and locked in interest rate when it proposed the Lock In Agreement to Mr. Marron and Class Members.

89.     Chase failed to properly calculate the locked in interest rate and discount points, thus breaching its duty to Mr. Marron and Class Members.

90.     As a result of Chase's negligence, Mr. Marron and Class Members was unable to shop around for other mortgages with more favorable interest rates, paid the Lock-In Fees, and ultimately received an interest rate higher than the one promised in the Lock In Agreement.

91.     As a result of Chase's conduct, Mr. Marron and Class members have suffered damages in the amount of extra money paid each month for the mortgage due to the increase of the interest rate.

## Eighth Cause of Action

**Violation of the Unfair Competition Laws (By Mr. Marron and California Subclass Only)**

92.     Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

93.     California Business & Professions Code § 17200 et seq. ("UCL") defines unfair competition as any unlawful, unfair, or fraudulent business act or practice. Section 17203 authorizes injunctive, declaratory, and/or other equitable relief with respect to unfair competition as follows:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been required by means of such unfair competition.

California Business & Professions Code § 17203.

94.     Through the conduct alleged herein, Chase engaged in unlawful business practices by engaging in fraudulent behavior by miscalculating the discount points Mr. Marron and Class Members were entitled to, thereby causing Chase to offer a lower interest rate in the Lock In Agreement than Chase would later offer in the note and deed of trust/mortgage, for which this Court should issue declaratory, injunctive and/or other equitable relief, pursuant to Cal. Bus. & Prof. Code § 17203, as may be necessary to prevent and remedy the conduct held to constitute unfair competition.

95.     As a result of Chase's conduct, Mr. Marron and Class Members have suffered damages in the amount of extra money paid each month for the mortgage due to the increase of the interest rate. Declaratory and injunctive relief is necessary to prevent and remedy this unfair competition, and pecuniary compensation alone would not afford adequate and complete relief.

96.     Mr. Marron and Class Members lost money which Chase retained in the form of increased mortgage payments based on the interest rate promised in the Lock In Agreement, as well as the charge for the Lock In Agreement.

97.     Mr. Marron and Class Members have no plain, speedy, and/or adequate remedy at law that will end the unfair and unlawful business practices of Chase. As a result of the unfair and unlawful business practices described above, Mr. Marron and Class Members have suffered and will continue to suffer irreparable harm. In addition, Chase should be required to disgorge the surplus to Mr. Marron and Class Members and any other unjust enrichment Chase received at Mr. Marron's and Class Members' expense.

## Ninth Cause of Action

### Reformation (By Mr. Marron and California Subclass Only)

98.     Plaintiff and Class Members re-allege and incorporate by reference each and every allegation set forth in this Complaint with the same force and effect, and further alleges as follows:

99.     Cal. Civ. Code § 3399 states:

> When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.

Cal. Civ. Code § 3399.

100.    Chase procedure the note and deed of trust from Mr. Marron and Class Members through fraud, specifically by offering a Lock In Agreement promising one interest rate in exchange for a payment and then providing Mr. Marron and Class Members a higher interest rate anyway.

101.    As alleged above, Chase, based on its own calculations, calculated the discount points and locked interest rate in the Lock In Agreement.

102.     Chase later claimed that those calculations were incorrect and ultimately offered Class Members and Mr. Marron a note and deed of trust/mortgage with a higher interest rate.

103.     When presented with the note and deed of trust/mortgage, Mr. Marron and Class Members had no choice to but to sign the note and deed of trust/mortgage because interest rates had rose since signing the Lock In Agreement and Mr. Marron and Class Members was unable to obtain any other offers as the original rate in the Lock In Agreement.

104.     Because Chase obtained Mr. Marron's and Class Members' signature on the note and deed of trust/mortgage through fraud, the Court should reform the note and deed of trust to have an interest rate of 2.625%

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Mr. Marron and Class Members pray for judgment against JPMorgan Chase Bank, N.A., as follows:

1.     An order certifying that this action is properly brought and may be maintained as a class action;

2.     2.     An order appointing Plaintiff Ronald Marron as class representative of the Class, and the an appropriate law firm as counsel for the Class;

3.     An order requiring Chase to bear the costs of Class notice;

4.     Compensatory Relief in an amount to be determined at trial;

5.     Injunctive Relief, including but not limited to an order preventing JPMorgan Chase Bank, N.A. from continuing its illegal activities;

6.     Disgorgement of profits and surplus from the money obtained from Mr. Marron and Class Members;

7.     Reformation of the note and deed of trust to reflect the interest rate on the Lock In Agreement; and

8.     Any such other and further relief as this Court may deem necessary, just, and/or proper

Date:   July 15, 2024

Michael G. Olinik

Attorney for Plaintiff Ronald A. Marron

# EXHIBIT 1

# LOCK-IN AGREEMENT

Lender: JPMorgan Chase Bank, N.A.

Borrower(s): Ronald A. Marron

Loan Amount: $708,000.00

Loan Type: 30 year fixed

Date: 02/12/2021

Loan Number: 1389789707

Property Address: 3385 b Street, San Diego, CA 92102

Term: 30 years

Financing Type: Conventional

---

**PLEASE READ THE TERMS AND CONDITIONS OF THIS AGREEMENT CAREFULLY.** In this Agreement "I", "me", "my" means all of the applicants who sign below. The words "you", "your" and "Lender" mean JPMorgan Chase Bank, N.A.

**LOAN COSTS AND TERMS:** Refer to your Loan Estimate for a full description of your loan costs and terms. If you're shopping for a home, we'll provide your Loan Estimate once we receive the address of the property that will secure the loan.

☐ **I. FLOAT OPTION**
   **I don't want to lock in my interest rate,** discount points and fees at this time. Interest rates, discount points and fees are subject to change and it is my responsibility to monitor Lender's loan terms during the period in which I choose to float. I may lock in my interest rate at any time during the term of my float. Lender is required to provide the Closing Disclosure to me at least three business days before my closing can take place so I have time to review it and ask questions. To lock my rate, discount points and fees, I will contact my Mortgage Banker.

☐ **II. NOT LOCKED**
   **I understand I can't lock in an interest rate** while still shopping for a home and that a property address is required before I can lock in my interest rate.

☒ **III. LOCK-IN OPTION**
   **I want to lock in my interest rate,** discount points and fees at this time. I HAVE ELECTED THE 45 DAY LOCK OPTION AS DETAILED BELOW.

The rate and points stated in this agreement are based on several factors, including but not limited to: loan amount, documentation type, loan type, occupancy type, property type, credit score, and loan to value (which is your loan amount compared to your property value). The final rate and points may be higher or lower based on information relating to factors such as those listed above, which may be determined after the date of this agreement.

| INTEREST RATE: | 2.625% | DISCOUNT POINTS | 0.764% | $5,409.12 |
|---|---|---|---|---|
| EXPIRATION DATE: | 03/29/2021 | | | |

### FEES ASSOCIATED WITH LOCK OPTIONS:

| LOCK IN FEE: | 0.000% | $0.00 |
|---|---|---|
| FLOAT DOWN FEE: | 0.000% | $0.00 |
| RATE CAP FEE: | N/A | N/A |
| EXTENDED LOCK-IN FEE: | N/A | N/A |

NOTE: LOCK-IN, EXTENDED LOCK-IN AND, DEPENDING ON THE OPTION SELECTED, RATE CAP FEES, PAID PRIOR TO CLOSING WILL BE CREDITED AT CLOSING TOWARD CLOSING COSTS.

**EXPIRATION DATE:** If the Expiration Date falls on a weekend or Lender-observed holiday, the Expiration Date will extend to the next business day. If my loan does not close by the Expiration Date, I may be charged a rate lock extension fee.

☐ If checked, the interest rate is adjustable and subject to change. The initial interest rate shall be the rate specified above. I hereby acknowledge that an Adjustable Rate Mortgage ("ARM") Disclosure describing the features of my ARM has been provided to me.

### SELECT A LOCK-IN OPTION

☒ **15, 30, 45, 60, 75 or 90 DAY LOCK:** I have selected the 15, 30, 45, 60, 75 or 90 Day Lock Option as specified above which locks in my interest rate and/or points for the loan program for the applicable time period.

---

1389789707

Lock-In Agreement - Multi-state
CL5220RNA 05/19 (replaces 1/17)

2021021220.3.0.3368-J20201124Y

*MPX1389789707_0204_7221*

Page 1 of 2

☐ **45 OR 60 DAY LOCK FLOAT DOWN OPTION:** I have selected the 45 or 60 Day Lock Float Down Option which allows me to lock in for 45 or 60 days, as specified above. If the interest rate and/or points for the loan program and lock period I have selected decrease during the 30 calendar days prior to my loan closing, then I may obtain a new lower rate and/or points (the "Float Down Rate"). I may only select a Float Down Rate that corresponds to my original lock period. For example, if my original lock-in is for 60 days, my Float Down Rate must be selected from the then current 60-day rate options that correspond to my loan program. My new Expiration Date will be the earlier of my original Expiration Date or the date 30 calendar days from my election of the Float Down Rate.

☐ **RATE CAP OPTION:** I have selected the Rate Cap Option which allows me both to lock in for a period of 90, 120, 150, 180, 270 or 360 days as specified above and the opportunity to close at a rate and/or points lower than my locked rate and/or points as specified below.

☐ **EXTENDED RATE LOCK OPTION:** I have selected the Extended Rate Lock Option which allows me to lock in for a period of 120, 150, 180, 270 or 360 days as specified above.

## FEES

**LOCK-IN, EXTENDED LOCK-IN AND RATE CAP FEES (together "Lock-In Fees"):** I agree to pay Lock-in Fees in the amount(s) stated above to lock-in my interest rate, discount points and fees. Lock-in, Extended lock-in and, depending on the option selected on the Rate Cap, Rate Cap Fees will be credited at closing toward closing costs.

To exercise my **one-time option** to lock a rate and/or points lower than my existing locked rate and/or points, as described in the 45 or 60 Day Lock Float Down Option, Rate Cap Option paragraphs immediately above, I will contact my Mortgage Banker. I understand that I will be responsible for monitoring Lender's interest rates, discount points and fees in connection with this float down option.

**FLOAT DOWN FEE:** I agree to pay a Float Down Fee, if applicable, in the amount stated above. I understand that I must pay an upfront Float Down Fee as stated above. This Float Down Fee is in addition to any other fees which I will or have already paid to lock my interest rate, discount points and fees. **EXCEPT AS DESCRIBED BELOW, <u>LENDER WILL RETAIN THE ENTIRE FLOAT DOWN FEE AS AN EARNED FEE FOR SERVICES PROVIDED. THE FLOAT DOWN OPTION FEE ISN'T REFUNDED AT CLOSING OR APPLIED TO CLOSING COSTS.</u>**

**REFUNDABILITY OF LOCK-IN AND FLOAT DOWN FEES:** These Lock-In and Float Down Fees will be refunded to me if my loan application is denied for credit reasons. **These Lock-In and Float Down Fees won't be refunded to me if I have withdrawn my application or my loan doesn't close and fund by the Expiration Date of this Agreement, if I supply inaccurate or incomplete information or, unless approved in writing by Lender, I change the type, term, property or amount of the loan for which I applied.** The Float Down Fee won't be refunded if I fail to exercise the Float Down Option.

I won't be entitled to any interest that may accrue on the Lock-In, Extended Lock-In, Rate Cap or Float Down Fees, whether or not they are refunded to me. If I have any questions, I'll contact my Mortgage Banker.

## OTHER CONDITIONS AND DISCLOSURES

**COMMITMENT:** I understand that this agreement isn't a loan approval or a commitment to offer a loan. Lender will make a good faith effort to process my loan application and, if approved, to close and fund my loan prior to the expiration date.

**ASSIGNMENT:** I may not assign this agreement to any other person.

**VERIFICATION:** This lock-in is subject to verification of all information provided to Lender in my application and credit report. The locked interest rate, fees and points may be subject to change if my credit standing changes or unless approved in writing by Lender, if I change the type, term, property or amount of loan for which I applied, or in the event any information I have provided to Lender in my application or otherwise is found to be false or incorrect in any way, or if I have selected Lender Paid Mortgage Insurance and my loan-to-value ratio changes by date of closing.

**Borrower**

| | |
|---|---|
| _DocuSigned by:_ | 02/13/2021 |
| *[signature]* | |
| 085FA99999994992 | |
| **Ronald A. Marron** | **Date** |

Lender: JPMorgan Chase Bank, N.A.

The name below will serve as our signature.

By: Holmes Thompson Bennett III     02/12/2021
     SA-Executive Mortgage Banker     Date

NMLS ID: 693865

Lock-In Agreement - Multi-state
CL5220RNA 05/19 (replaces 1/17)

1389789707

2021021220.3.0.3368-J20201124Y

Page 2 of 2

*MPX1389789707 0204 7221*

# EXHIBIT 2

# DOC# 2021-0363796



May 12, 2021   08:00 AM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES: $140.00   (SB2 Atkins: $75.00)

PAGES: 17

**Recording Requested By:** Amrock Title California Inc.

**Return To:** JPMorgan Chase Bank, N.A. Chase Records Center Attn: Collateral

Trailing Documents, RE:MC 8000

700 Kansas Lane

Monroe, LA 71203

**Property Address:** 3385 b Street, San Diego, CA 92102

**Parcel Number:** 539-571-09-00

# Deed of Trust

**Definitions.** Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) *"Security Instrument"* means this document, which is dated April 27, 2021, together with all Riders to this document.

(B) *"Borrower"* is  Ronald A. Marron, Trustee of the 2013 Ronald A. Marron Trust Dated September 26, 2013 . Borrower's address is 3385 b St, San Diego, CA 92102. Borrower is the trustor under this Security Instrument.

(C) *"Lender"* is JPMorgan Chase Bank, N.A.. Lender is a National Banking Association organized and existing under the laws of the United States of America. Lender's address is 1111 Polaris Parkway, Columbus, OH 43240-2050. Lender is the beneficiary under this Security Instrument.

(D) *"Trustee"* is JPMorgan Chase Bank, N.A..

(E) *"Note"* means the promissory note signed by Borrower and dated April 27, 2021. The Note states that Borrower owes Lender Seven hundred two thousand and 00/100 Dollars (U.S. $702,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2051.

(F) *"Property"* means the property that is described below under the heading "Transfer of Rights in the Property."

(G) *"Loan"* means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) *"Riders"* means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

|   |   |   |
|---|---|---|
| ☐  Adjustable Rate Rider | ☐  Condominium Rider | ☐  Second Home Rider |
| ☐  Balloon Rider | ☐  Planned Unit Development Rider | ☐  1-4 Family Rider |
| ☐  VA Rider | ☐  Biweekly Payment Rider | ☒  Other(s) [specify] Trust Rider |

---

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Initials: _____ Page 1 of 14



*MPX1389789707 0233 7003*

**(I)** *"Applicable Law"* means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** *"Community Association Dues, Fees, and Assessments"* means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** *"Electronic Funds Transfer"* means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** *"Escrow Items"* means those items that are described in Section 3.

**(M)** *"Miscellaneous Proceeds"* means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** *"Mortgage Insurance"* means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** *"Periodic Payment"* means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** *"RESPA"* means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, RESPA refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** *"Successor in Interest of Borrower"* means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**Transfer of Rights in the Property.** This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County [Type of Recording Jurisdiction] of San Diego [Name of Recording Jurisdiction] See Legal Description

Parcel ID Number: 539-571-09-00 which currently has the address of 3385 b Street [Street] San Diego [City], California 92102 [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Initials: _____
Page 2 of 14



*MPX1389789707 0233 7003*

**Uniform Covenants.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Initials: _____ Page 3 of 14



*MPX1389789707 0233 7003*

Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Initials: _____ Page 4 of 14

*MPX1389789707 0233 7003*

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Initials: _____ Page 5 of 14

*MPX1389789707 0233 7003*



If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Page 6 of 14

Initials: _____



*MPX1389789707 0233 7003*

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(A) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(B) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage**

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.
2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Page 7 of 14

Initials: 



Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Page 8 of 14

Initials: _____



*MPX1389789707 0233 7003*

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Initials: _____ Page 9 of 14

*MPX1389789707 0233 7003*



Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

1389789707
Form 3005 1/01
02/21
Page 10 of 14

2021042721.1.0.3543-J20210222Y

Initials: _RM_

*MPX1389789707 0233 7003*



result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**Non-Uniform Covenants.** Borrower and Lender further covenant and agree as follows:

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Page 11 of 14

Initials: 

*MPX1389789707 0233 7003*

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above. A copy of any Notice of Default and any Notice

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

1389789707
Form 3005 1/01
02/21
Page 12 of 14

2021042721.1.0.3543-J20210222Y

Initials: _RK_

*MPX1389789707 0233 7003*



of Sale will be sent only to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**Trustee**

_(signature)_ 4/27/2021

**RONALD A. MARRON, Individually**          Date
**and as Trustee of the 2013 RONALD**          _Seal_
**A. MARRON TRUST under trust**
**instrument dated September 26, 2013.**

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

2021042721.1.0.3543-J20210222Y

1389789707
Form 3005 1/01
02/21
Page 13 of 14

Initials:  _R.A.M._

*MPX1389789707 0233 7003*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of San Diego**

On _APRIL 27, 2021_, before me, _PAUL Filipowicz_, Notary Public, personally appeared

_Ronald A. Marron_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Notary Public_

My commission expires:
_09-13-2025_

PAUL FILIPOWICZ
Notary Public - State of Idaho
Commission Number 20191881
My Commission Expires Sep 13, 2025

**Loan Origination Organization:** JPMorgan Chase Bank, N.A.

**NMLS ID:** 399798

**Loan Originator:** Holmes Thompson Bennett III

**NMLS ID:** 693865

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Wolters Kluwer Financial Services, Inc.

1389789707
Form 3005 1/01
02/21
Page 14 of 14

2021042721.1.0.3543-J20210222Y

Initials: _R Am_

*MPX1389789707 0233 7003*

# Inter Vivos Revocable Trust Rider

**Definitions Used in this Rider.**

   **(A) "Revocable Trust."** The 2013 RONALD A. MARRON TRUST created under trust instrument dated September 26, 2013.

   **(B) "Revocable Trust Trustee(s)."** RONALD A. MARRON, trustee(s) of the Revocable Trust.

   **(C) "Revocable Trust Settlor(s)."** RONALD A. MARRON, settlor(s), grantor(s), or trustor(s) of the Revocable Trust.

   **(D) "Lender."** JPMorgan Chase Bank, N.A.

   **(E) "Security Instrument."** The Deed of Trust and any riders thereto of the same date as this Rider given to secure the Note to Lender of the same date and covering the Property (as defined below).

   **(F) "Property."** The property described in the Security Instrument and located at:

3385 b Street, San Diego, CA 92102

[Property Address]

THIS INTER VIVOS REVOCABLE TRUST RIDER is made April 27, 2021, and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s), and the Revocable Trust Settlor(s) and the Lender further covenant and agree as follows:

   **Additional Borrower(s).**

   The term "Borrower" when used in the Security Instrument shall refer to the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and the Revocable Trust, jointly and severally. Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein or by acknowledging all of the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as "Borrower" on the first page of the Security Instrument, each covenant and agreement and undertaking of the "Borrower" in the Security Instrument shall be such party's covenant and agreement and undertaking as "Borrower" and shall be enforceable by the Lender as if such party were named as "Borrower" in the Security Instrument.

BY SIGNING BELOW, the Revocable Trust Trustee(s) accepts and agrees to the terms and covenants contained in this Inter Vivos Revocable Trust Rider.

**Trustee**



| | |
|---|---|
| **Ronald A. Marron, Individually and** | 4/27/2021 |
| **as Trustee of the 2013 RONALD** | *Date* |
| **A. MARRON TRUST under trust** | *Seal* |
| **instrument dated September 26, 2013.** | |

Inter Vivos Revocable Trust Rider-CA
© 2012 Wolters Kluwer Financial Services, Inc.
All rights reserved.

2021042721.1.0.3543-J20210222Y

1389789707

03/20
Page 1 of 2

*MPX1389789707 0197 1946*

BY SIGNING BELOW, the undersigned Revocable Trust Settlor(s) acknowledges all of the terms and covenants contained in this Inter Vivos Revocable Trust Rider and agrees to be bound thereby.

**Settlor**

_Ronald A. Marron (signature)_      4/27/2021

**RONALD A. MARRON**      **Date**

            *Seal*

Inter Vivos Revocable Trust Rider-CA
© 2012 Wolters Kluwer Financial Services, Inc.
All rights reserved.

2021042721.1.0.3543-J20210222Y

1389789707

03/20
Page 2 of 2



*MPX1389789707 0197 1946*

## EXHIBIT A - LEGAL DESCRIPTION

Tax Id Number(s): 539-571-09-00

Land situated in the City of San Diego in the County of San Diego in the State of CA

LOTS 1, 2 AND 3 BLOCK 148 OF CHOATES ADDITION, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 167, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, NOVEMBER 1886.

Commonly known as: 3385 B ST, San Diego, CA 92102-2427

NOTE: The property address, tax parcel identification number, and property type are provided solely for informational purposes and are not insurable for this transaction.